ROBERT D. EASSA, Bar No. 107970
REassa@browneassa.com
ANDREW K. MURPHY, Bar No. 258102
AMurphy@browneassa.com
CAMERON J. HOYLER, Bar No. 273234
CHoyler@browneassa.com
**BROWN EASSA & MCLEOD, LLP**
1999 Harrison Street, Suite 1800
Oakland, California 94612-3520
Telephone:    510.444.3131
Facsimile:    510.839.7940

Attorneys for Defendants
CHEVRON CORPORATION,
CHEVRON U.S.A. INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **JOSEPH KRUZICH,**<br><br>Plaintiffs,<br><br>v.<br><br>**CHEVRON CORPORATION, CHEVRON U.S.A. INC.,**<br><br>**Defendants.** | Case No.  C 11-04488 EMC<br><br>**DECLARATION OF ANDREW K. MURPHY IN SUPPORT OF OPPOSITION TO PETITION TO COMPEL ARBITRATION**<br><br>Date: November 4, 2011<br>Time: 1:30 p.m.<br>Courtroom: 5, 17th Floor |

I, Andrew K. Murphy, declare that:

1.    I am an attorney at law duly licensed to practice before all courts of the State of California and in the United States District Court, Northern District of California, and am an associate in the law firm of Brown, Eassa & McLeod LLP, attorneys of record for Chevron Corporation and Chevron U.S.A. Inc. ("Chevron"). The facts set forth in this declaration are based on my personal knowledge, on matters of which I am informed as counsel, and on my review of the firm's papers and records. If sworn as a witness, I could and would testify competently to these facts.

2.    Chevron was engaged in a co-venture with PetroChina to develop a natural gas

1. field in China when Chevron hired Plaintiff Joseph Kruzich ("Plaintiff").

2. 3. Chevron hired Plaintiff for the position of Manager, Policy Government and Public Affairs to work exclusively in China.

3. 4. Plaintiff's job performance did not meet Chevron's expectations.

4. 5. Plaintiff's superior at Chevron informed him of the necessity of developing strong ties with PetroChina. As a result of Plaintiff's poor job performance, Chevron terminated his employment. Attached as **Exhibit A** is a true and correct copy of Chevron's June 30, 2009 email to Plaintiff.

5. 6. After Plaintiff was notified of his termination, he submitted a letter containing a severance demand to Chevron. In addition to the severance demand, Plaintiff, for the first time, made numerous allegations regarding his employment. However, Plaintiff's letter did not provide any details of the alleged claims. A true and correct copy of the Plaintiff's severance demand is attached hereto as **Exhibit B**.

6. 7. A true and correct copy of Chevron's Human Resources Policy No. 344 "Steps to Employee Solution" ("STEPS") is attached as **Exhibit C**.

7. 8. On September 29, 2009, Chevron and Plaintiff attended a mediation session to resolve this dispute. However, the parties were unable reach a resolution.

8. 9. Plaintiff's counsel filed a Complaint with the Equal Employment Opportunity Commission ("EEOC"). During the EEOC's investigation, Chevron offered binding arbitration to Plaintiff. Plaintiff rejected Chevron's offer for binding arbitration.

9. 10. Attached as **Exhibit D** is a true and correct copy of the EEOC's June 15, 2011 determination letter.

I declare under the penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct.

Executed on September 30, 2011 in Oakland, California.

Andrew K. Murphy

- 2 -

**DECLARATION OF ANDREW K. MURPHY IN SUPPORT OF OPPOSITION TO PETITION TO COMPEL ARBITRATION - C 11-04488 MEJ**

BROWN EASSA
1999 HARRISON STREET, SUITE 1800
OAKLAND, CALIFORNIA 94612-3520

# EXHIBIT A

Cover, David (DavidCover)

From: Nelson, David C.
Sent: Tuesday, June 30, 2009 9:11 AM
To: Kruzich, Joseph
Subject: Response To Your Letter

Joe:

As discussed, following below is a response to your letter of June 18th.

First, after reading your letter I disagreed with it in several respects. You are incorrect in your statement that your work on the project has been excellent. While the component task coordinating temporary resettlements associated with the overall well workover program was effective, the more critical and main focus of your performance surrounding permanent resettlement has not met expectations. I relayed my concerns to you in April and May on the importance of maintaining good stakeholder relations with PetroChina as a prerequisite to influencing good project outcomes in the area of permanent resettlement. I also gave you my best advice and coaching as well as arranging venues to support, what I had hoped would be, your efforts to repair the strained relationship between you and PetroChina. You yourself acknowledged those problems in that relationship in our discussion and in your email to Maria Pica early last week. We may disagree on the reasons and responsibility for the failure of that crucial relationship but it is a fact that it has failed.

I strongly rebut your statement disparaging Chevron's commitment to conduct resettlement in accordance with IFC standards. Chevron remains fully committed to pursuing the permanent resettlement work consistent with IFC standards. I and the entire CDB leadership team are personally committed to this. However, as noted above, our ability to maintain a constructive and influential working relationships with PetroChina will play a critical role in achieving these objectives.

I cannot comment on your statement concerning comments by PetroChina employees about female assignees to the CDB project. As you know, we do not control the statements and actions of PetroChina as they are a separate entity.

I am concerned about the allegation of racist remarks made by any Chevron employees, particularly any under my management. That is unacceptable behavior on the part of any Chevron employee. Please give me the name of the individual or individuals who allegedly made the remark and I will respond accordingly. I did find your claim on this point suspicious as allegations of this type should have been brought immediately to management's attention, not delayed and only revealed later in the context of your request for large severance payment.

In response to your severance proposal, the facts and policy relevant to this case do not support payment of severance. You are being offered a company paid redeployment period in Beijing and given until August 31, 2009 to find another position, either within Chevron or outside of it. If you are unable to find a position by August 31 your employment with Chevron will end.

As a professional courtesy, I offered to allow you to work from the Beijing office to make your job search easier and more productive, and to give you ready access to Chevron's Human Resources department. Following packing of your household goods on Friday June 26, 2009 and upon arrival in Beijing you will be

1

expected to comply with Chevron Policy 585-Travel Policy and Principles and the procedures noted in that policy. Essentially, that means you will need to stay at company approved accommodations and the company will reimburse your reasonable expenditures for meals and other expenses incurred in accordance with Policy 585.

Depending on the results of your job search, and prior to any termination, Human Resources will send you information on full repatriation benefits should you elect to repatriate to the United States.

**Dave Nelson**
General Manager Chuandongbei Gas Project
Shangri-La Center - Level 27
9 Binjiang Road East
Chengdu, 610021, China
+86-28-6555-3101 (office)

# EXHIBIT B

Dave,

In light of our discussion yesterday (June 17, 2009), I have decided to develop a severance package as an alternative to moving to the Chevron Beijing office. We both know that my performance for the past seven months on the project has been excellent, and you and others have consistently praised my work on well intervention, organizing PGPA and pushing forward the permanent resettlement process to ensure that it complied with the IFC PS 5 standards that Chevron committed itself to abide by. As late as May 22, 2009 I briefed, along with you, several senior Chevron representatives on the status of the resettlement program and received very positive reviews. Similarly, over the past several months you have praised my work on well intervention and community management and have continuously stated that my performance was far exceeding expectations.

In this context, the turn of events this week has left me stunned. There is no documented evidence that I have been counseled on any issue relating to inadequate performance nor given a performance improvement plan which would lay the basis for job termination. Indeed, we only finished up the terms of my PMP last week, so there is no basis for making such a quick decision to remove me from CDB. It is obvious to me, I am being ordered to leave to appease the demands of our partner, and not for performance related reasons. I have no control over our partner's willingness to work with me and it is unrealistic and unjust to think that anyone in the PGPA manager position would have that capability.

As you know, over the past several weeks I have become increasingly concerned about the trend in permanent resettlement and Chevron's continuing commitment to conduct resettlement consistent with IFC PS 5 standards. My main concern is that the work orders to Petro China, ostensibly to assist on land surveys, asset inventory and replacement housing, have become the vehicle for letting our partner control the pace and schedule of resettlement, which will inevitably harm the integrity of the consultation process. This will substantially raise the reputational risk to Chevron and put in jeopardy the project schedule.

In light of the events this week, I see little chance my situation at Chevron will improve by moving to our Beijing office. Instead, I have developed a severance package proposal that protects my interests and is fair to Chevron. Under this proposal, instead of moving to the Beijing office, I would move to Beijing and have 90 days to stay in a hotel in Beijing to commence my China job search. I propose that I leave CDB on Friday, June 19, but we will need to work out the details of this severance package before I move to Beijing.

**Severance Package Proposal**

**Remaining Payment on anticipated tour in Chengdu – 4 years**

US $800,000 (tax protected)

**Job Search and Training:**

US $25,000

<u>Payment for loss of professional reputation and infliction of emotional distress and creation of "hostile work environment"</u>

US $500,000 (tax protected)

For the past several months, with the full knowledge of Chevron, Petro China has engaged in an unremitting campaign to lie about by professional performance, to harass and humiliate me in front of Chevron colleagues and government contacts and to threaten me with other measures if I didn't listen to them. In addition, they have openly questioned my hiring of female employees, implying that because of their gender they were naturally unqualified, in violation of U.S. anti-discrimination laws. Likewise, a senior MCP leader and Chevron colleague openly engaged in "racist" rhetoric in a meeting on April 28 to discuss the SWOG work orders, describing a problem as a "nigger in the woodpile."

**90 days of housing at a five star hotel in Beijing of my choosing and reasonable meal allowance ($100/day) to conduct a China job search.**

**The continuation of all health, dental and optical benefits for 18 months.**

**A copy of my personal file and job performance related documents**

# EXHIBIT C

# HR Policy 344 for U.S.-Payroll Employees
# Steps To Employee Problem Solution Process

1. **GENERAL**

   It is company policy to encourage employees to bring questions, complaints or problems involving their employment to the attention of their immediate supervisor without fear of censure or retaliation. While the matter may not always be resolved to the employee's complete satisfaction, in many cases misunderstandings may be cleared up and disputes settled.

   The **Steps To Employee Problem Solution (STEPS)** Process provides formal procedures which employees can use to present and receive a response to a concern about the way company policies, practices, or rules are applied to them personally. It applies to all U.S. company employees (including Casual, Co-op, Seasonal and Part-time employees) who are not represented by a union. The process contained in this policy also applies to non-represented former employees as long as the matter of dispute occurred while they were employed by the company. Non-U.S. company locations may utilize this policy, subject to the legal requirements of their host country.

   The company **cannot and does not guarantee employment or compensation** to any employee for a particular period of time or indefinitely. Supervisors, managers or other employees who represent the company in employment matters, must avoid statements which could be viewed as promise of permanent employment, promotion, or future compensation. Company publications should also be monitored to avoid such statements.

   **Each employee has the right to and is free to terminate his or her employment with the company with or without cause or notice at any time. Similarly, the company has the right to terminate an employee's employment and compensation with or without cause or notice at any time. Nothing in this policy alters, modifies, or changes the at-will relationship between the company and its employees.**

   This policy does not apply to complaints involving the administration of company benefit plans for which separate appeal procedures are available as part of the plans, nor may it be used to request changes to policies, rules, staffing, pay structures and systems, operations, severance programs, business decisions or practices (downsizing, reorganization, restructuring), or other similar responsibilities of management. In addition the process is not intended for use concerning unemployment compensation claims, worker's compensation claims, protection of technology and confidential information, and discipline resulting from violations of the company's drug and alcohol policies.

   Issues or complaints involving allegations of harassment require an investigation and must be handled according to procedures contained in HR Policy No. 420 rather than through Steps One and Two of this policy. If the harassment complaint is not resolved, an employee may enter the STEPS Process at Step Three.

Employees do not give up any rights to seek other legal remedies if they are unable to resolve disputes using the STEPS Process. The company, however, requires that employees do use STEPS before proceeding to litigation. An employee's continued employment at Chevron will mean they agree to use STEPS.

The process used by the company for handling disputes has four steps with the following key points:

Step One

**Open Door** discussion with an employee's supervisor or another member of the employee's management or with Human Resources. Use of this step by employees is voluntary. Employees are encouraged to bring any issue of concern to their supervisors through Step One.

Step Two

**Internal Facilitation** of an employee's concern done at the supervisory level with the assistance of unbiased company personnel. The assistance for the employee and his or her supervisor will be either a trained internal facilitator, a Human Resources business partner/counselor or a review panel. This step is also voluntary and applies to eligible issues as defined above.

Step Three

**Mediation** is only for legally protected rights involving individual employee claims. Class-wide (i.e. involving a group of employees) legal complaints may not use Step Three. It involves submitting the dispute to an objective, outside mediator selected jointly by the employee and the company. Neither the employee or the company are required to accept the resolution proposed by a mediator. It is mandatory to use Step Three before proceeding to Step Four.

Step Four

**Arbitration** is used for a legally protected right that is not resolved in Step Three. As in Step Three, only individual disputes and not class-wide ones may use Step Four. Use of an objective, outside arbitrator, selected jointly by the employee and company, is a more formally defined process than mediation. If the employee accepts the arbitrator's decision, it becomes binding on the company and employee. An employee is free to seek other legal remedies if he or she is not satisfied with the arbitrator's decision. If Steps Three and Four are not used, the company will request that legal proceedings be suspended until Steps Three and Four are utilized.

Details on all four steps of the process are given under the GUIDELINES section of this policy.

**Ombuds Program**

Every employee will have access to an ombuds and may utilize this service at any time before or during the four-step process. An ombuds is a designated high-level neutral who provides confidential and informal resolution assistance to employees. An employee may contact the ombuds for assistance and, if requested, the employee's identity will not be disclosed. Thus, employees are able to have a confidential internal source to assist them with their concerns. All ombuds will follow the "Standards of Practice and Code of Conduct" with the Ombuds Association.

**Covered Disputes**

Step One may be applied to any employee concern. Step Two may be used for any employee concern subject to the limitations listed above. Steps Three and Four cover issues involving legally protected rights only - those that can be asserted in a court of law. For example, a complaint about an evaluation under the Performance Management Process (PMP) or other records documenting employee performance or a work assignment based on something other than discrimination could be resolved in Steps One and Two but could not proceed to Steps Three and Four. Those complaints eligible for Steps Three and Four include claims for discrimination, retaliation or harassment on the basis of age, gender, race, color, national origin, religion, disability, pregnancy, marital status, sexual orientation, veteran's status or any other protected status.

Legally protected rights also include causes of action relating to employment or termination of employment based on claims of wrongful discharge, breach of employment contract, breach of covenant of good faith and fair dealing, fraud, defamation and violation of public policy. The Corporate or appropriate Operating Company Law Department will make the determination if an issue involves a legally protected right.

Applicable collective bargaining agreement provisions will apply to employees represented by unions.

## II.  GUIDELINES

**1.  Responsibility**

Managers and supervisors are responsible for assuring employees that they will not be retaliated against for utilization of this policy for resolving their concerns. This is consistent with the principles contained in Corporate Policy 1 - The Chevron Way.

**2.  Step One - Open Door**

Discussion with an employee's supervisor offers the quickest and most efficient way to resolve a concern. Working to resolve issues through your immediate supervisor has always been an integral part of company policy. To improve effectiveness of "open door" discussions, the

company will regularly provide supervisors with conflict resolution skills training.

Step One applies to all employee concerns and is voluntary. It allows employees to talk to their immediate supervisor or to a higher level of management without fear of retaliation. Under Step One, management is responsible for helping employees resolve their workplace concern, and it provides employees with several options.

**Immediate Supervisor** - Whenever possible, employees should try to resolve any workplace concern with their immediate supervisor. Because supervisors are closer to the situation, they may be in the best position to offer employees a new perspective or some new facts.

**Higher Level Supervisor** - If employees are unsatisfied with their immediate supervisor's response or need to talk to someone other than their supervisor, employees may take their problem to the next higher level of supervision. Employees are encouraged to follow the specific supervisory chain in their department or work group, since that is the best way to resolve concerns.

**Human Resource Business Partner/Counselor** - At any time, employees may also choose to contact their HR counselor for advice and assistance. In most instances, this person has many years of experience helping employees deal with a variety of workplace issues.

**Chevron Hotline** - Employees may also call the Chevron Hotline at 800 284-3015 to file a confidential, anonymous complaint.

3.  **Step Two - Internal Facilitation**

    Step Two attempts to resolve employee concerns internally at the supervisory level with the assistance of internal facilitation. At this stage, employees will be assisted by a trained internal facilitator, or perhaps a HR counselor or business partner. In some Operating Companies, review panels may also be used. Business units and corporate departments will more fully develop this step on a local basis and communicate it to employees.

    This step is also voluntary and applies to issues covered by this policy. It begins by an employee filing a "Record of Internal Facilitation" which describes the complaint and the employee's desired resolution, with the employee's supervisor. The request is given to Human Resources where it is determined if the issue is eligible for Step Two. If the request is eligible, Human Resources arranges the internal facilitation method of choice for the particular facility or location. Depending upon the local option selected, this may involve a meeting among the employee, the employee's supervisor and a trained facilitator or the matter may referred to a review panel for consideration.

    Whatever form Step Two takes, it will end with a written response to an employee's complaint and, hopefully, full resolution of the matter. The goal of this step is to solve the problem, rather than determine who is right or wrong. The written response from the company will be provided within four weeks of initiation of Step Two.

If an employee is unable to resolve an issue in Step Two, and the issue involves a legally protected right, the employee may proceed to:

4. **Step Three – Mediation**

   Only individual complaints, not class-wide complaints, may use Step Three. An employee initiates this step by completing a **Mediation Request Form** (GO – 1606) and forwarding it to Human Resources. Human Resources then forwards the request to the appropriate Operating Company or Corporate Law Department for determining if the complaint is eligible for Step Three. If the complaint is eligible, the appropriate law department provides a locally developed list of outside mediators. The employee and his or her management jointly select a mediator from this list. During the mediation, both parties informally explain their respective positions and try to resolve the problem. The mediator's role is to listen, offer suggestions, and try to help those involved agree to a resolution. The meeting is informal, and there are no witnesses, testimony, deposition, or subpoenas. An employee may choose to be represented by an attorney during the Mediation Step. The process is designed to be cooperative and problem-solving.

   Neither an employee nor the company are required to accept a resolution proposed by the mediator. However, if a proposed resolution is acceptable to both the employee and the company, that resolution will be final and binding. An employee must submit the issue to mediation before proceeding to Step Four.

   The company will pay the cost of the mediation. If the complaint is resolved, the company will pay the employee for reasonable attorneys' fees, up to $1,500, assuming the employee chooses to be represented by counsel. If the matter is not resolved at Step Three-Mediation, employees will pay their own attorney fees.

   If the issue is not resolved in Step Three and involves a legally protected right, the employee may proceed to:

5. **Step Four – Arbitration**

   Only individual complaints, not class-wide complaints, may use Step Four. An employee initiates this step by completing a **Arbitration Request Form** (GO – 1607) and forwarding it to Human Resources. Human Resources then forwards the request to the appropriate Operating Company or Corporate Law Department where contact is made with the American Arbitration Association (AAA) or similar independent organization and a list of arbitrators is obtained. The employee and his or her management then jointly select an arbitrator from this list. Arbitration is a more formal process than mediation, but not as formal as a court proceeding.

   At the arbitration hearing, both the employee and the company have the right to consult with or be represented by an attorney. Each party has the right to subpoena witnesses and documents, present evidence and arguments, and hear and challenge the other party's evidence and

witnesses. The arbitrator will render a decision and is authorized to award whatever remedies would be available to the employee under law, including damages and back pay.

If the employee is satisfied with and accepts the arbitrator's decision, that decision will be binding on the company and the employee as a final resolution of the matter. The company does reserve the right to appeal an arbitrator's decision to a court or under the rules of the arbitration/mediation service if the decision was based on gross error, bias, prejudicial exclusion of evidence or the award sustains or orders conduct that is illegal or contrary to public policy. If not satisfied with the arbitrator's decision, the employee is free at that time to pursue the matter through other legal options, including litigation.

If the employee accepts the arbitration decision, the company will pay all direct expenses of the arbitration and up to $5,000 of the employee's attorney's fees, unless provided otherwise by the arbitrator. If the decision is not accepted, the company will pay the direct expenses of the arbitration and the employee will be responsible for his or her expenses and attorney's fees. Arbitration costs will be controlled through use of an Arbitration Agreement that will procedurally limit such items as discovery, use of expert witnesses and depositions.

6. **Counsel**

   Counsel on this policy may be obtained from the Employee Relations unit of Human Resources/North America Shared Services and the Corporation Law Department or appropriate Operating Company Law Department.

### III. FURTHER GUIDANCE AND REFERENCES

Corporate Policy 1 - The Chevron Way
Corporate Policy 226 – Discipline

HR Policy 400 – Equal Employment Opportunity
HR Policy 420 - Harassment in the Workplace
HR Policy 900 - Labor Relations
HR Policy 1020 – Performance Management Process

STEPS Program Web site http://hr.chevron.com/northamerica/us/programs-policies/steps/

Effective April 2005
Replaces October 2001

# EXHIBIT D



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**San Francisco District Office**

350 The Embarcadero, Suite 500
San Francisco, CA 94105
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
San Francisco Status Line: (866) 408-8075
San Francisco Direct Dial: (415) 625-5602
TTY (415) 625-5610
FAX (415) 625-5609

Charge No. 550-2010-00086

Mr. Joseph Kruzich                                    Charging Party
c/o Cliff Palefski
McGuinn, Hillsman & Palefski
535 Pacific Avenue
San Francisco, CA 94113

and

Chevron Texaco
6001 Bollinger Canyon Road
Building A
San Ramon, CA 94583                                   Respondent

## DETERMINATION

Under the authority vested in me by the Commission, I issue the following determination as to the merits of the charge filed under Title VII of the Civil Rights Act of 1964, as amended (Title VII). All jurisdictional requirements have been met.

Charging Party alleges that from in or about January 2009 to June 2009, he was harassed, transferred, relieved of his duties, and notified of his impending discharge based on his national origin and in retaliation for engaging in protected activity. Charging Party further alleges that from in or about September 2009 to in or about November 2009, he was discriminated against based on his national origin and retaliated against for engaging in protected activity in that he was discharged and subsequently denied relocation expenses and arbitration after his discharge.

Respondent denies that it has discriminated against Charging Party.

Based upon the investigation, I am unable to conclude that Charging Party was harassed, transferred, relieved of his duties, discharged, or denied relocation expenses based on his national origin in violation of Title VII. Based upon the investigation, I am also unable to conclude that Charging Party was transferred, relieved of his duties, discharged, or denied

Joseph Kruzich v. Chevron Texaco
Letter of Determination
EEOC Charge No. 550-2010-00086
Page 2 of 2

relocation expenses for engaging in protected activity. This does not certify that Respondent is in compliance with the statute.

However, the investigation revealed that Charging Party was denied arbitration by Respondent in retaliation for engaging in protected activity.

Based upon the evidence, I have determined that there is reasonable cause to believe that Respondent discriminated against Charging Party for engaging in protected activity when they denied Charging Party arbitration.

Section 706(b) of Title VII of the Civil Rights Act of 1964, as amended (Title VII), requires that if the Commission determines that there is reasonable cause to believe that a violation has occurred, it shall endeavor to eliminate the alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. Having determined that there is reasonable cause to believe that a violation has occurred, the Commission now invites the parties to join with it in a collective effort toward a just resolution of this matter.

A representative of the Commission will contact you in the near future to begin the conciliation process. Disclosure of information obtained by the Commission during the conciliation process will be made only in accordance with Section 706(b) of Title VII and Section 1601.26 of the Commission's Procedural Regulations. When the Respondent declines to enter into settlement discussions, or when the Commission's representative for any other reason is unable to secure a settlement acceptable to the Office Director, the Director shall so inform the parties in writing.

You are reminded that Federal Law prohibits retaliation against persons who have exercised their right to inquire or complain about matters they believe may violate the law. Discrimination against persons who have cooperated in Commission investigations is also prohibited. These protections apply regardless of the Commission's determination on the merits of the charge.

On Behalf of the Commission:

06/15/2011
DATE

Michael Baldonado
District Director